Good morning, Your Honors. Sean O'Keefe. May it please the Court, Sean O'Keefe on behalf of U.S. Philips Corporation. Also with me today is Co-Counsel Robert W. Pitts. We would like to preserve as much time as possible to respond to the appellee's arguments, so I'd like to emphasize the following points. We start from an order which was designed to prevent exactly what happened here. It barred the transfers and it froze the accounts. So exactly what happened is what it was designed to prevent. The second issue is this is a case where the appellee received notice on May 1 of that injunction. They received a copy of that order by fax, and in the excerpts of Record 109, their counsel, Anderson Kilinolic, acknowledges that they received it on August 1. Third point, this is a case where the $1.6 million that was received by KBC Bank Singapore was received after notice. They received those funds unlawfully after they had notice of an injunction barring those transfers. What they should have done was simply refuse a deposit. There were two things I think they should have done. At a minimum, they needed to disclose an account. If you look at the record here. Why? What relation did the bank have with Phillips? They weren't Phillips' bankers. Their relationship was to the federal court issuing them an order which specifically stated you are not to receive funds. But that doesn't say you have to account and advise us what you're doing. It just said you're not to receive funds. My question to you, Mr. O'Keefe, is what should they have done more than say do not allow this transfer into the account? Send it back. I think at a minimum, I think that is exactly what they should have done. That's all they should have done, and that would have stopped the deposit from becoming subject to the banker's lien. That's exactly right, Your Honor. Now, they didn't do that. That's exactly right. They were in violation of the TRO. That's exactly right. Have you brought an order to show cause and recontent? Your Honor, the reason why the timing of that didn't occur, we didn't learn about these and get a full understanding of the facts until October of 2007. At that point, we were in the midst, and that's the reason why I included the Nevada order, to give the court a perspective on the absolute war we were involved with this group of defendants. This was a day-to-day issue, violating orders, massive sanctions. It had no effect upon this group of defendants, and so we were endeavoring to deal with those problems. Yes, we were dealing with this, and yes, we intended to bring a motion to compel the turnover of those funds and for contempt if necessary, but their motion was filed first, and that's why it's before Your Honors. I still don't know why you haven't filed a motion in recontempt to seek damages for the contemptuous ignoring of the order. Your Honor, we interpret the lower court's order as modifying and lifting it, essentially nunc pro tonc. That's how we interpret their order, such that the relief that we obtained through that injunction was vitiated, so that at this point, after the enter of that order, we do not have the ability to go in and seek contempt sanctions. Otherwise, we would be in there immediately. Why? I mean, they were in contempt before the final judgment was entered, which dissolves a preliminary injunction, but they were in contempt then, and you suffered damages as a result of their contemptuous behavior. I agree, Your Honor. However, the timing of this was there was a determination by Judge Reel to our detriment, essentially vitiating that injunction nunc pro tonc, notwithstanding the fact that he was aware of this course of conduct. But Judge Reel's order was entered after a default judgment was taken by you for $85 million in permanent patent protection. That is absolutely right. However, our understanding was obtained from the subpoena and subsequent documentation that was produced pursuant thereto, and that was received, as I recall, in October, and it was processed in November. So it was only at that point in time that we were gearing up to go in and seek relief. It just so happened that- Counsel, Counsel, Judge Gould has a question for you, if I may. Why wouldn't your default judgment spell the end of the preliminary injunction? Under normal principles, doesn't a preliminary injunction kind of end when the court enters the final judgment? So, you know, what I have had trouble understanding is why didn't Phillips get that injunctive language that was in the preliminary injunction put into the default judgment, into its final judgment? And do we have a situation where the injunction kind of as a matter of law ceased when you got your default, which might render moot the question whether the judge should have modified it or not? It's a fairly bizarre set of circumstances, but I assume you might have thought of this. So let me have your thoughts on it. Absolutely, Your Honor. The mootness issue raised by the appellee only applies to the extent there's an attack on the merits of the underlying order. What happened during the window of the injunction, that universe stays and is not affected by the subsequent judgment. I would cite to the court Reliance Insurance, the MAST, which is in Appellee's Papers 84F3-372, quote, Generally speaking, a person who violates an injunction or temporary restraining order during its pendency is subject to a compensatory civil contempt judgment, even if the injunction or restraining order later terminates due to the passage of time or mootness. So if you don't have the statute of limitations barring your claim now, why don't you make a claim now? Your Honor, to the extent it were the interpretation of this court that the order in this case, which is the subject of this appeal, does not vitiate those rights, then we certainly would do that. However, we interpreted the lower court's ruling as depriving us of the ability to do that. But if we follow the suggestion made by Judge Gould that the default judgment ended the preliminary injunction so that Judge Wheel's motion modifying the preliminary injunction is without any effect and therefore moot, the appeal would be therefore moot. Well, I would respectfully submit that the effect of the order is to vitiate our contempt rights. Why? Because if you take it, this may not be fair, Mr. O'Keefe, but are you now making a judicial admission that you stipulate that Judge Wheel's modification order ended any compensation rights you had under the contempt possibility? No, I'm not, Your Honor. I hope you wouldn't. I'm not, Your Honor. To the extent that that's a viable recourse, we certainly would pursue that. However, and I want to preserve my time here, I would simply point out that that's an entirely new orientation for us, and I'm surprised. Well, sometimes you get a thought when you come to the court. I hear you, Your Honor. We felt that if we moved for contempt before Judge Wheel, after he had granted them the right to take the funds, essentially received the fruits of their wrongdoing, that we would have been thrown out of court. And so we felt as though this was our only recourse, since inherent in his decision was a decision to allow them to receive and offset against funds unlawfully received through this transfer. Counsel, if we say that Judge Wheel's modification of the injunction was a nullity because it had already ceased as of the final judgment, or if we say we'll review it and it's invalid, can you go back and seek your contempt now, or do you have a time limit on that that would preclude that? No, I think we can. However, I would respectfully submit that the better recourse is to do what the First Circuit did in Jemco, which is to say this is a case where you violated the injunction. We're going to deem those transfers void, non-proton, put the money back in the registry of the court. Then if you think you have priority to these funds, come into the court and process those claims. If you think you have priority on some basis, make those claims there. But the better recourse for the mandate would be a reversal and ordering the return of those funds to that court. And then if they want to make a claim that simply receiving funds unlawfully and applying those to your debt based on an offset argument is simply not a viable legal position. I'd like to preserve what time I have left. Counsel, something occurs to me before you make your statement. Is this a case that would benefit by mediation? Because it sounds to me like if time hasn't run for seeking relief by contempt proceedings or damages for contempt, you're just going to have another lawsuit. Well, first of all, good morning, Your Honor. James Andreola from Reed Smith on behalf of the KDC Bank NV, which was a non-party in the underlying action. The parties did go through the court-mandated mediation process that did not resolve the case, fortunately or unfortunately, which brought us here. So we did attempt the mediation route. At this level or in the district court? At the level here at the Ninth Circuit. Oh, pardon me. Go ahead. Okay, Your Honors, just generally, put very simply, you know, KDC Bank has a contractual and common law right of set-off to the funds at issue, and the asset freeze order that existed for less than two months back in the summer of 2007 did nothing to disturb the bank's right of set-off. Well, you agree that while the asset freeze was in effect, the bank should not have accepted the deposit from the other bank. The direction to financial institutions in the asset freeze order said that the banks should not transfer, hide, secrete, dispose of assets. Right. The bank did not do that. So the whole talk that there could even be a finding. But to transfer, I mean, to accept a deposit is to allow the transfer to occur. If you stop the door and say, we're not going to take that money, I realize that's very hard for a bank to say. I can't think of a bank ever saying, we won't take a deposit. But in this particular case, you had an extra grant by taking the deposit. You wanted to take the deposit so that you could apply your lien to it. Right. So and you knew they were going to do that, or you should have known that. You said, hooray, we've got over $2 million here that are being deposited. Let's let it deposit so we can put our lien on it. But at the time you did that, you were under either a TRO or a preliminary injunction saying, do not allow transfers of funds of this corporation. And you did allow the transfer because you did allow the deposit. But I've never seen an asset freeze order interpreted in a way that prevents a bank from receiving funds. What it tells the bank is when funds come in, you freeze those funds until further order of this court. And that's exactly what happened in this case, Your Honors. The idea that somehow KVC Bank was hiding these assets, I mean, as early as September 14th, three days before they got their final judgment, my firm sent a letter to the prior counsel for Philips stating, we have a right to the funds at issue that we're holding. We put them on notice. And instead of them doing that. Counsel, it's Judge Gould with a question. When your client applies the funds against the debt it's owed, like takes a set off, isn't that converting the funds to their use? Well, that's why. So if there's a if there's a contest as to who should get these funds, you or Philips, shouldn't the funds be back in the district court here where you guys could sort of have at it? Your Honor, that's exactly what happened, actually. The funds were not applied. The funds were frozen, sequestered in a in a separate account. And then we went to the court and said, we have a, you know, a right of set off to these funds that would trump them as a prejudgment creditor. So please clarify your prior order that says we can go ahead and apply those funds. So we certainly didn't convert any funds. We did exactly what the order said. We froze the funds and we went to the court for guidance as to what to do with those funds. And in that process, we said we have a right of set off that trumps any right they could have as a future judgment creditor. But as a possessor of a lien, true? You have to have possession in order to have a lien as to those funds. And when you allowed the transfer to occur, you took possession of the funds. We took possession of the funds, Your Honor. And you could have refused taking possession of the funds by saying to the transferor entity, we render an asset freeze which says we cannot allow a transfer of this client's funds, so therefore we cannot accept your deposit. And then Phillips could have gone to the transferor who didn't have a lien and levy on those funds there. That scenario is possible. I'm not aware of the technology that the bank has to stop a wire en route to it, and there's nothing in the record offering. You just refused the deposit. I mean, suppose you have a deposit from somebody who's a well-known gangster. You don't want that money in your bank. You say we don't take it. Send it back. I'm not familiar with the technology of how you can stop a wire transfer from coming in. I know you can grab it once it comes in, and that's what we did, which is a normal practice. I'll study up on whether there's a technological advancement that you can reject a wire transfer. Why can't you wire it back? We're not allowed to wire it back. The asset freeze order said you cannot transfer funds, so we absolutely could do that. You interpret that wire freeze order saying the door swings one way. The money can come in, but it can't go out. I'm not being cute, Your Honor, but there isn't anything that says an asset, a financial institution, is not permitted to receive funds. It says it's not able to then transfer, distribute, secrete, hide the funds, and we certainly didn't do any of that. We got the funds. We paid our debt. We have the funds. Taking your line of argument, it's just making me wonder if this has to be sort of an exception to the case where the scope of an injunction is moot by a final judgment because you're saying you got the funds. You couldn't send them back, so they couldn't be returned to the court for it to entertain this dispute between your bank and Phillips. And now I thought you were saying that because the default rendered that issue moot, there's no further issue that can be addressed and it should be dismissed. Well, we in our brief did point out on the mootness that you're getting to that in the event the modification is reversed, there is no asset freeze in place. It expired, we all agree, September of 2007. But if the modification was reversed, couldn't we order or if it was reversed, would your bank be required to send the funds back to the district court or not? Not without further orders from the district court requiring that. And the district court could have required that and they could have asked for it from the district court. But that issue was never raised below your honor. It is very complicated. Thanks. I think all the remaining time, I think all the cases raised in their opening brief, we demonstrated how those really are inapplicable to this situation. There was a case they raised in their reply brief that we hadn't had a chance to address, the Jemco case that was mentioned. That case is equally inapplicable since the term set off doesn't even appear in that case. And that was a case where the district court made a finding that the bank had conspired with the judgment debtor to circumvent a court order. And that case involved a court order saying all banks have to turn over the funds immediately to the court. And the judgment debtor and the bank worked together to avoid that. So it's a completely different situation and doesn't even involve, like I said, if you search the term set off, it doesn't appear in that case. Unless there's anything further, your honors. Brief response, your honors. There was a transfer. The transfer was a violated transfer from the KXD digital to the bank. At that point, funds were transferred by and pursuant to that line of authorities we've identified unlawfully. There was nothing for the bank to take via an offset. 9203 of the UCC is crystal clear. You can only take the rights that your transfer has. Clearly at this juncture, the 1.6 million that they received, knowing violation of the injunction, there's no conceivable way they could take a right in those funds. The same thing for the New York funds, the 1,004,000 and change. All of that was received after notice. So at that point, they knew those funds were in a special trust, and that's why we cited that 100-year line of authority. You can take no more than your transferor has to give. Insofar as counsel's argument, counsel admits that the lower court ruling was premised upon the issue of law identified, that they had offset rights as to unlawfully received funds, and that's why the ruling was made. That is a clear error of law. And so far as the relief in this case, the reason why the Jemco case is relevant, yes, there was the extra provision you have to turn over the funds. However, I would also note that that's a distinction without a difference here. The funds have to go back because they were unlawfully transferred. The concept is the transfer is void ab initio. Otherwise, the injunction is meaningless. They have to go back. Well, did the transferor into the bank have notice of the TRO and preliminary injunction? Absolutely, Your Honor. That was the technology company. Yes, Your Honor. In fact, they were aware to the nth degree. They were in court. Is there any claim that the transferor technology company was in cahoots with the bank and wanted to make this transfer because there was some pending loan that the bank would make to the technology company if they paid off the $1.6 million and the $1.2 million? Your Honor, there is nothing specifically in the record to that effect. However, I would note that $2.6 million was transferred in violation of a court order to this bank. Since that bank was unsecured as to those funds, logic would say there was a driver since they knew they were going to be penalized, and that's why we introduced the Nevada court order since they were being penalized for exactly this kind of conduct. So they knew there would be consequences, yet they did it anyway. In 20 years, I haven't found a debtor who's enthusiastic for paying his bank in the face of an injunction sanction. Finally, Your Honor, I would submit to the court that the right belief is to compel the return of the funds to the registry of the court because that honors the effect of the injunction. And at that point, to the extent that they have a universe of claims against Phillips or anybody else with respect to those funds, they can be resolved. And why do you say that you can't bring an action for damages for contempt of court at this time? Your Honor. Or do you say that? Your Honor, the only point I would make is, given the existence of the order, if we brought that motion before the lower court, we would be on perilous grounds with the lower court because of that order. So once that order... But if this court were to find that that order were a nullity, the order of Judge Rayl amending the preliminary injunction, if we found that to be a nullity, what would be the perilous grounds? At that point, absolutely not, Your Honor. We could proceed. The only point I would make... All right. That's just what I get. ...is that this court has all the facts before it and it has the ability to do justice. There are no disputed facts here. And by simply requiring that the injunction, State of Affairs, be put back the way it was intended to be, at that point, we have an opportunity for justice for all parties without more litigation. Thank you very much. Thank you, Your Honor. The case of Phillips v. KBC Bank will be marked submitted. Thank you, counsel, for your argument in what is a very interesting case. Judge Gould, you had indicated we should take a break. Do you want to take it now or after the next case? Well, I was thinking after the next case, that would be fine. All right. Because we'd gone on a little bit longer than we thought we would.
judges: Molloy, Gould, Bea